# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THOMAS ROWE,<br><br>                Plaintiff,<br><br>v.<br><br>DPI SPECIALTY FOODS, INC., and<br>JAMI FLOYD,<br><br>                Defendants. | **MEMORANDUM DECISION<br>AND ORDER DENYING MOTION FOR<br>JUDGMENT AS A MATTER OF LAW**<br><br><br>Case No. 2:13-cv-708-DN<br><br>District Judge David Nuffer |

On September 1, 2015, the jury in this matter returned a verdict in favor of Plaintiff Thomas Rowe on his claims for defamation and intentional interference with economic relations ("IIER") against Defendants DPI Specialty Foods, Inc. ("DPI"), and Jami Floyd (collectively "Defendants").[1] At the end of Mr. Rowe's case, Defendants made a motion for judgment as a matter of law under Fed.R.Civ.P. 50(a) on all claims ("50(a) Motion"). Defendants' 50(a) Motion was granted in part and reserved in part.[2] On October 26, 2015, Defendants filed a renewed motion for judgment as a matter of law under Fed.R.Civ.P. 50(b) ("50(b) Motion").[3] After careful review and consideration of the parties' memoranda, the trial record, and the applicable law, Defendants' 50(b) Motion is DENIED for the reasons set forth below.

---

[1] Jury Verdict, docket no. 208, filed September 2, 2015.

[2] Order Granting in part and Reserving in part Defendants' Rule 50 Motion for Judgment as a Matter of Law, docket no. 197, filed August 29, 2015.

[3] Defendants' Rule 50(b) Motion for Entry of Judgment as a Matter of Law and Memorandum in Support ("50(b) Motion"), docket no. 218, filed October 26, 2015.

BACKGROUND ................................................................................................................ 2
STANDARD OF REVIEW ............................................................................................... 3
DISCUSSION .................................................................................................................... 4
    A.     Mr. Rowe Introduced Sufficient Evidence From Which A Jury Could Reasonably
           Infer that Defendants Made the Alleged Defamatory Statements ........................ 4
           1.    Misappropriated Money Statement ............................................................ 7
           2.    "Smith's No longer Wants Rowe" statement ........................................... 14
           3.    "Others in the Industry" Statement ......................................................... 19
    B.     Sufficient Evidence was Submitted From Which a Jury Could Reasonably Infer
           that Defendants Acted with the Requisite Degree of Fault................................... 22
    C.     There was Sufficient Evidence from Which a Jury Could Reasonably Infer that
           the Defamatory Statements were the Actual and Proximate Cause of Mr. Rowe's
           Damages ............................................................................................................. 25
CONCLUSION ................................................................................................................ 27

# BACKGROUND

The relevant factual background was recounted in an earlier summary judgment

memorandum decision and order filed on June 4, 2014, but some of the facts will be repeated for

the reader's convenience.[4] Mr. Rowe was terminated from his employment at Premier Sales

Solutions ("Premier"). Premier is a food broker that works with retailers and distributors. At the

time of Mr. Rowe's termination, Robert Kinsella was Premier's owner and president. Mr. Rowe

was employed by Premier for five years, during which time he worked with Smith's Food &

Drug Centers, Inc. ("Smith's"). Prior to joining Premier, Mr. Rowe worked with Smith's in the

deli category for approximately fourteen years. Premier had contracted with DPI to assist DPI

with the sale of deli food products to Smith's. DPI is a distributor and manufacturer of various

specialty food items and markets its items to various retailers, including Smith's. During the time

period in which the alleged defamatory statements occurred, Mr. Rowe was the lead of the

---

[4] Memorandum Decision and Order Denying Defendants' Motion for Summary Judgment, docket no. 65, filed June 4, 2015.

Premier team that assisted and supported DPI in supplying deli products to Smith's, and Ms. Floyd was the head of the DPI team responsible for deli sales to Smith's.

Mr. Rowe's Complaint asserts two causes of action—defamation and tortious interference with economic relations.[5] Mr. Rowe alleges that in August 2012, Ms. Floyd, within the course and scope of her employment with DPI, began to make defamatory statements regarding Mr. Rowe. Mr. Rowe argues the defamatory statements caused him to be removed from the Smith's account in September 2012. And although Mr. Rowe remained employed with Premier for several months after his removal from the Smith's account, his employment with Premier was ultimately terminated in January 2013. Mr. Rowe alleges that the termination was a result of Defendants' defamatory statements. On September 1, 2015, the jury in this matter returned a verdict in favor of Mr. Rowe on both his claims.

## STANDARD OF REVIEW

A party is entitled to judgment as a matter of law "only if the court concludes that 'all of the evidence in the record . . . [reveals] no legally sufficient evidentiary basis for a claim under the controlling law.'"[6] All reasonable inferences must be drawn in favor of the nonmoving party, in this case Mr. Rowe.[7] A court must not "weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury."[8] Because this is a diversity case, "the substantive law of the forum state governs the analysis of the underlying claims, including specification of

---

[5] Complaint, docket no. 2-1, filed July 29, 2013.

[6] *Wagner v. Live Nation Motor Sports, Inc.,* 586 F.3d 1237, 1244 (10th Cir. 2009) (quoting *Hysten v. Burlington N. Sante Fe Ry. Co.,* 530 F.3d 1260, 1269 (10th Cir. 2008)).

[7] *Id.*

[8] *Id.*

the applicable standards of proof, but federal law controls the ultimate, procedural question whether judgment as a matter of law is appropriate."[9]

## DISCUSSION

Defendants contend Mr. Rowe has failed to present sufficient evidence at trial to sustain a verdict in his favor for three reasons. First, Mr. Rowe failed "to present evidence that Defendants actually made any of the statements that provided the foundation for his defamation and IIER claims."[10] "Second, Mr. Rowe also failed to present evidence that Defendants violated the higher standard of fault triggered under the common interest privilege."[11] "Third, Mr. Rowe did not present sufficient evidence that Defendants caused his damages."[12] Each argument is discussed in turn.

### A. Mr. Rowe Introduced Sufficient Evidence From Which A Jury Could Reasonably Infer that Defendants Made the Alleged Defamatory Statements

In order to establish a defamation claim, a plaintiff must demonstrate that "(1) the defendant published the statements . . . [in print or orally]; (2) the statements were false; (3) the statements were not subject to privilege; (4) the statements were published with the requisite degree of fault; and (5) the statements resulted in damages."[13]

The following three statements formed the basis of Mr. Rowe's defamation and IIER claims: (1) "[t]hat Defendants told Robert Kinsella that Mr. Rowe misappropriated money in connection with a charity golf tournament;" (2) "[t]hat Defendants told Robert Kinsella that Smith's no longer wanted Mr. Rowe to call on them;" and (3) "[t]hat Defendants told others in

---

[9] *Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1175 (10th Cir. 2008) (citation and internal quotation marks omitted).

[10] 50(b) Motion at 2–3.

[11] *Id.* at 3–4.

[12] *Id.* at 4–5.

[13] *DeBry v. Godbe*, 992 P.2d 979, 982 (Utah 1999).

the industry that Smith's refused to deal with Mr. Rowe because he refused to work on competitive products."[14] Defendants contend that Mr. Rowe failed to establish that Defendants made any of the above three statements.[15] Defendants point out that "Mr. Rowe admitted that he did not personally hear Defendants make any of these alleged statements."[16] Also, "Mr. Rowe did not present any writing or document showing that Defendants made the alleged statements in written form."[17]

One of Defendant's main arguments on all three of the alleged defamatory statements is that Mr. Rowe failed to produce any direct evidence "showing that the Defendants actually made the alleged defamatory statements."[18] The record is devoid of any direct evidence that the statements were made. But the legal effect of this is unclear.

Defendants contend that "[i]n a valid defamation case, there should be no question that the defendants, in fact, made the statements at issue."[19] In support, Defendants cite to the following language from *Wayment v. Clear Channel Broadcasting, Inc*:[20] "In order to state a claim for defamation under Utah law, a plaintiff must show 'that defendants published the statements concerning him . . . .'"[21] The Utah Supreme Court in *Wayment*, however, does not state whether the publication element of a defamation cause of action must be proven by direct

---

[14] 50(b) Motion at 6 (citing Corrected Order Granting Defendants' Motion in Limine to Preclude Evidence or Argument of New Alleged Defamatory Statements, docket no. 174; Order Granting in Part and Denying in Part Motion for Clarification Regarding [134] Order Granting [79] Motion in Limine, docket no. 175; Order Granting in Part and Reserving in Part Defendants' Rule 50 Motion for Judgment As a Matter of Law, docket no. 197).

[15] 50(b) Motion at 6.

[16] *Id.* (citing Rowe Tr. at 7:22-8:10, docket no. 218-1, filed October 26, 2015).

[17] *Id.*

[18] Defendants DPI Speciality [*sic*] Foods, Inc.'s and Jami Floyd's Reply to Plaintiff Thomas Rowe's Opposition [Dkt. 241] to Defendants' Rule 50(b) Motion for Entry of Judgment as a Matter of Law [Dkt. 218] at 2 ("Reply"), docket no. 250, filed January 15, 2016 (emphasis in original).

[19] Reply at 3.

[20] 116 P.3d 271, 278 n.2 (Utah 2005).

[21] *Id.* (quoting *West v. Thompson Newspapers*, 872 P.2d 999 (1994)).

evidence or whether circumstantial evidence will suffice. Defendants also cite *Oman v. Davis School District*;[22] *Brehany v. Nordstrom*;[23] and *Zoumadakis v. Uintah Basin Med. Ctr., Inc.*[24] None of these cases support Defendants' contention that direct evidence is essential.

Defendants cite no Utah case law in support of their argument that direct evidence is essential. However, Utah's case law on circumstantial evidence generally, holds that critical elements of a claim may be proven by circumstantial evidence. The Utah Court of Appeals in *Harding v. Atlas Title Ins. Agency, Inc.*,[25] explained the distinction between circumstantial evidence and mere speculation:

> While it is sometimes subtle, there is in fact a difference between drawing a reasonable inference and merely speculating about possibilities. [A]n inference is a deduction as to the existence of a fact which human experience teaches us can reasonably and logically be drawn from proof of other facts. On the other hand, speculation is defined as the act or practice of theorizing about matters over which there is no certain knowledge. The difference lies in the existence of underlying facts supporting the conclusion. In the case of a reasonable inference, there is at least a foundation in the evidence upon which the ultimate conclusion is based; in the case of speculation, there is no underlying evidence to support the conclusion.[26]

Although *Harding* dealt with a motion for summary judgment, it was later cited by the Utah Court of Appeals in *Francis v. National DME,*[27] which involved a jury trial. Accordingly, the publication element of a defamation cause of action may be proven by circumstantial evidence in the record sufficient for the jury to make a reasonable inference of publication.

Further, Utah also appears to have relaxed pleading rules for defamation compared to other states. In Utah, there is no law "directly requiring that the complaint also allege with

---

[22] 194 P.3d 956 (Utah 2008).

[23] 812 P.2d 49 (Utah 1991).

[24] 2009 UT App 135, 2009 WL 1423559.

[25] 285 P.3d 1260 (Utah Ct. App. 2012).

[26] *Id.* (citations omitted).

[27] 350 P.3d 615 (Utah Ct. App. 2015).

complete specificity when, where, to whom, or by whom, the alleged defamatory statements were made[.]"[28] This, combined with Utah's generous acceptance of circumstantial proof of critical elements, defeats Defendants' argument which is made without case law support.

### 1. Misappropriated Money Statement

Defendants raise three points in support of their argument that Mr. Rowe has failed to present sufficient evidence that they told Mr. Kinsella that Mr. Rowe misappropriate money at the golf tournament. "First, both parties to the alleged statement, Defendants and Mr. Kinsella, denied that any such statement occurred."[29] This first point, however, is a question of credibility which was appropriately resolved by the jury.

"Second, the evidence at trial showed that Mr. Rowe's allegation concerning the Misappropriated Money statement was nonsensical."[30] Defendants point out that the evidence at trial established that Mr. Rowe did not personally handle any money in connection with the golf tournament. Therefore, "Defendants had no reason to make such a statement, given that they knew he did not handle money, and Mr. Kinsella would never have understood such a statement as defamatory."[31] This second point is also a question for the fact-finder.

Defendants' final point is that "Mr. Rowe failed to present evidence that Defendants actually made the Misappropriated Money Statement."[32] Although no witness at trial testified that they heard Ms. Floyd or any other DPI employee tell Mr. Kinsella that Mr. Rowe "had misappropriated money in connection with a charity golf tournament," Mr. Miale testified that he

---

[28] Defamatory Statements Order at 7 (quoting *Boisjoly v. Morton Thiokol, Inc.*, 706 F.Supp. 795, 800 (D. Utah 1988)).

[29] *Id.* at 7.

[30] *Id.*

[31] *Id.* at 7–8.

[32] *Id.* at 8.

had conversed with Mr. Kinsella shortly after Mr. Kinsella's phone conversation with Defendants when Defendants allegedly made the defamatory statement. Defendants argue that Mr. Miale's testimony is double hearsay and should not be considered. However, this hearsay objection was raised and overruled twice.[33] Mr. Miale testified:

> Q. This is an e-mail from Mr. Rowe to yourself on September 6, 2012. He said, "Mark, Just because you mentioned it was brought up, I have attached my credit card statement showing the charges at the Smith's golf tournament." And then he discusses in detail what took place relating to the golf tournament raffle and monies that had been allocated for that event. I want to focus on the first statement, "Just because you mentioned it was brought up." Do you recall mentioning to Mr. Rowe that the subject of the golf tournament raffle had been brought up?
>
> A. Yes, I do.
>
> Q. And by whom was it brought up?
>
> A. I believe it was brought up that Rob [Kinsella] had made a comment to me about it.
>
> Q. What was Rob's comment to you?
>
> A. From what I can recall on this, I believe that, possibly, with some of the discussion that was - - that was happening relative to DPI, DPI possibly questioned something with Rob. He didn't give me a lot of good information on it. But, you know, Rob was just asking if - - you know, really, I guess questioning me about any more info that I had in regard to the expenses for this golf tournament.
>
> Q. It's important for me to just get every detail you can recall from that conversation regarding what Mr. Kinsella had heard or had to say. What exactly was the allegation that he relayed on to you?
>
> A. From what I can recall, I believe Rob had made some comments, I think. Again, I think it came from DPI to Rob, *that maybe the monies that were used for this weren't allocated as they should have been*.
>
> Q. Okay.
>
> . . .

---

[33] *See* Order Ruling on Objections in Deposition Designations for Witness Mark Miale, <u>docket no. 178</u>, filed August 20, 2015 (overruled because no hearsay or lack of foundation objection was raised in the deposition, <u>FRCP 32(d)(3)</u>); *see also* August 25, 2015 at 105, <u>docket no. 232</u>, field December 3, 2015.

Q. No. Sorry. He heard - - he heard something from DPI regarding that raffle tickets and what was or was not allocated or distributed. And I'm wondering who is the subject of these events?

A. Well, the subject of the - - the subject from Rob was - - was - - referring back to how Tom [Rowe] had handled these tickets at the event, from what I recall.[34]

The above testimony when considered with the testimony of two other witnesses—Zane Day and Angie Hayes—that had a direct conversation with Ms. Floyd, where she used the word misappropriate or language substantially similar, provides sufficient circumstantial evidence upon which a jury could reasonably infer that the alleged defamatory statement was made.

Mr. Day testified the following as to his conversation with Ms. Floyd:

Q. Did you ever participate in a call with Ms. Floyd or anyone else from DPI to discuss the specifics of those allegations?

A. Yes.

Q. Okay. And in that call, did you hear - - did Ms. Floyd recount those allegations to you?

A. Yes.

Q. And what did she say?

A. She said there was a - - there was concern that there was some issues of company funds and that they involved Tom and Mitch.

Q. Okay. So she said Tom and Mitch were involved. Okay. And do you recall if she specifically used the term "misappropriation"?

A. I'm not sure.

Q. This is the fun part of trial. Sorry. Do you remember being deposed in this case?

A. I do.

---

[34] Mark Miale Deposition Designations, 78:18–80:20, docket no. 242-43, filed December 17, 2015 (emphasis added).

Q. Okay. This is a transcript of that deposition. If you could open it. It's like Christmas in - - what are we, August? And, Mr. Day, I'll represent to you that's a copy of your deposition transcript. Does that appear to be what it is?

A. Yea.

Q. Do you remember that fun day when you were brought in and asked questions under oath?

A. Yes.

Q. Okay. If I could have you just turn in that deposition to page 82, lines 6 through 11.

. . .

Q. Okay. Now, was this issue of the Smith's charity golf tournament a topic that came up during your call with Ms. Floyd?

A. I believe it was, yes.

. . .

Q. Okay. Is your recollection now, Mr. Day, that Ms. Floyd did in fact use the term "misappropriation" in discussing those issues with you?

A. Yea. I'm not sure if the words are the same. I mean, now that I look at it, I see what I said, but it was either misuse or misappropriation of funds. I'm not exactly sure which one it was.

Q. Okay. That's a pretty minor discrepancy, Your Honor, but if we could, I would like to read the transcript into the record so we have that clear statement.

THE COURT: Go ahead.

Q. You were asked, Mr. Day: Okay. Do you recall the words she used to describe her concerns about the raffle? Answer: No, not other than what I've stated, that she felt or they felt that the funds that were being used for the golf tournament were improperly used. Question: Did she ever use the word "misappropriation?" Answer: Yes. Is that an accurate reflection of your testimony at your deposition?

A. That's what it says here, yes.[35]

Mr. Day's trial testimony reveals that he had a conversation with Ms. Floyd, the Smith's charity golf tournament was a topic of conversation during the call, Ms. Floyd discussed

---

[35] August 26, 2015 Trial Transcript at 349:20–353:9, docket no. 247-1, filed January 4, 2016.

concerns regarding issues of company funds involving Mr. Rowe and Mitch Alm (a former employee of Smith's), and Ms. Floyd used the word misappropriation or misuse during the phone conversation.

Ms. Hayes testified the following as to her conversation with Ms. Floyd:

Q. Did you ever hear an accusation made about Mr. Rowe's use of funds that were donated for Smith's golf tournament?

A. Yes.

Q. And who told you that? Who made that accusation? Sorry. I'm going to rephrase it. Did you hear that accusation made by someone?

A. Yes.

Q. And who made the accusation.

A. Rick Hansen.

Q. Okay. And what did Mr. Hansen tell you?

MR. CORY: Objection, Your Honor. Hearsay.

THE COURT: Sustained.

MR. BELL: All right.

Q. By Mr. Bell: Did you ever speak to Jami Floyd about this?

A. Yes.

Q. And what did Ms. Floyd tell you?

. . .

A. That was misappropriation of funds. We didn't really go into details, just - - it was pretty, you know, not a long conversation.

Q. Did Ms. Floyd use those terms to describe what Mr. Rowe had done?

A. Yes.

Q. Did Ms. Floyd ever tell you why Mr. Rowe was no longer on the Smith's account after he was removed?

A. No.

. . .

Q. Were you ever told what the reason was for Mr. Rowe's removal?

A. Just misappropriation of funds.[36]

. . .

Q. About when was this statement made?

A. I'm sorry. In the fall of 2012.

Q. Fall of 2012. Okay. Can you be more specific?

A. No.

Q. And do you recall the context in which this came up?

A. No.

Q. You don't have any idea how it came up?

A. No. Just chatting.

Q. Just chatting. So, out of the blue Ms. Floyd used the words, misappropriated funds?

A. While we were talking, yes.

Q. What were you talking about?

A. Work.

Q. Is that a common term that she used all the time in talking about work?

A. No.

Q. And you're sure it was the word misappropriated.

A. Yes.

Q. And it wasn't in relation to the government [*sic*] tournament, though?

A. No.

Q. So you're not sure what it was in relation to?

---

[36] August 28, 2015 Trial Transcript at 14:20–16:6, docket no. 230, filed December 3, 2015.

A. No.[37]

Ms. Hayes's trial testimony reveals that she had a conversation with Ms. Floyd regarding the accusation made about Mr. Rowe's use of funds and Ms. Floyd used the term "misappropriation of funds." Defendants argue that Ms. Hayes "testified at trial that Ms. Floyd's use of the word 'misappropriate' did not have anything to do with the golf tournament."[38] However, Ms. Hayes's testimony—during cross-examination—that the word misappropriate was not in relation to the golf tournament conflicts with her testimony during direct-examination, where she was asked whether she had heard "an accusation made about Mr. Rowe's use of funds that *were donated for Smith's golf tournament*?" Ms. Hayes's answer was yes. Ms. Hayes was then asked whether she had ever spoken "to Jami Floyd about this?" and "what did Ms. Floyd tell you?" Ms. Hayes answered that she had spoken to Ms. Floyd and Ms. Floyd told her it was about misappropriation of funds. The jury was free to make credibility determinations on any conflicting testimony.

Mr. Rowe presented evidence that "substantially agrees with the defamatory word alleged in the pleading,"[39] that is, Mr. Miale testified that "the monies that were used for this weren't allocated as they should have been." This accusation fits within the definition of misappropriation, which is defined as "[t]he application of another's property or money dishonestly to one's own use."[40] Accordingly, Mr. Miale's testimony when viewed cumulatively with all the other evidence in the case constitutes sufficient circumstantial evidence upon which a

---

[37] *Id.* at 30:11–31:9.

[38] Reply at 7.

[39] Corrected Order Granting Defendants' Motion in Limine to Preclude Evidence or Argument of New Alleged Defamatory Statement at 11 (the "Defamatory Statements Order"), docket no. 174, filed August 20, 2015 (citation and internal quotation marks omitted) (Plaintiff does not need to prove the identical words charged in the complaint, it is "sufficient if the proof substantially agrees with the defamatory words alleged in the pleading.").

[40] Misappropriation, Black's Law Dictionary (10th ed. 2014).

reasonable jury could infer that Defendants—during a conversation with Mr. Kinsella—accused Mr. Rowe of misappropriation of funds at the golf tournament.

### 2. "Smith's No longer Wants Rowe" statement

Defendants contend that Mr. Rowe failed to present any evidence at trial showing that the alleged statement—Smith's no longer wanted Rowe to work for it—was made. Defendants state that Ms. Floyd's 30(b)(6) deposition testimony cited during Mr. Rowe's opening statement (in a Power Point Slide) in support of this claim was incomplete. The 30(b)(6) deposition testimony that Mr. Rowe presented to the jury was the following excerpt:

> Q. . . . did DPI tell anybody at Premier that Smith's no longer wanted to work with Tom Rowe?
>
> A. Rob Kinsella was also aware of that.
>
> Q. And who told him that?
>
> A. I don't recall if it was Russ or myself at this time.[41]

Defendants argue that the use of the ellipses in the Power Point slide "was an attempt to hide the actual evidence of Ms. Floyd's statement."[42] "In reality, Ms. Floyd denied during her trial testimony, and during her 30(b)(6) deposition, having ever told Mr. Kinsella that Smith's no longer wanted Mr. Rowe to call on them."[43] According to Defendants, the full relevant testimony from Ms. Floyd's 30(b)(6) deposition testimony was the following:

> Q. Did you ever tell anybody at Premier that Smith's no longer wanted to work with Tom Rowe?
>
> A. I don't recall saying that.
>
> Q. Well, in September 2012, when you talked to Mr. Kinsella about aggressive e-mails sent by Mr. Rowe to Ms. Hanson, did you request that Mr. Rowe be removed from the Smith's account?

---

[41] 50(b) Motion at 12 (citing docket no. 191, filed August 26, 2015).

[42] *Id.*

[43] *Id.*

A. No. I just asked Mr. Kinsella for Mr. Rowe to not send harassing e-mails to our customer.

. . . .

Q. Did you ever tell anybody at Premier that Smith's was having problems with Tom Rowe?

Mr. Zarian: Same objection.

A. Only in the fact that Shellie was wanting to take more control of her business back, to use DPI more, and additional brokers in the market.

. . . .

Q. The question is: Did you ever tell anyone with Premier that Smith's no longer wanted to work with Tom Rowe?

Mr. Zarian: Objection, vague and unduly burdensome and oppressive and cumulative. You can answer, if you've got anything to add or if you understand the question and have anything you would like to respond. Do you understand the question?

A. Mm-hm. Yes. And I believe that I've already answered that.

. . . .

Q. The question is: Did you ever tell anyone with Premier that Smith's no longer wanted to work with Tom Rowe?

A. I had a conversation with Mr. Hanson just stating that Shellie had said that she would rather work with Rick on the account.

. . . .

Q. **Besides Rick Hansen**, did DPI tell anybody at Premier that Smith's no longer wanted to work with Tom Rowe?

Mr. Zarian: Clearly asked and answered because the question incorporates the previous answer, also vague.

A. Rob Kinsella was also aware of that.

Q. And who told him that?

A. I don't recall if it was Russ or myself at this time.[44]

Defendants argue that "at no point in the testimony does Ms. Floyd 'admit' that she made the 'Smith's No Longer Wants Rowe Statement' to Mr. Kinsella."[45] Defendants state that when read in context, "Ms. Floyd is clearly referring to her communication with *Mr. Rick Hansen*, not Mr. Kinsella[,]" when she answered "I don't recall if it was Russ or myself at this time."[46]

Mr. Rowe presented sufficient circumstantial evidence upon which a reasonable jury could infer that Defendants told Mr. Kinsella that Smith's no longer wanted Rowe to work for it. First, the jury could reasonably infer from Ms. Floyd's 30(b)(6) deposition testimony that either Russ Blake or herself informed Mr. Kinsella that Smith's no longer wanted to work with Mr. Rowe. Ms. Floyd testified as follows:

> Q. BY MR. BELL: Besides Rick Hansen, did DPI tell anybody at Premier that Smith's no longer wanted to work with Tom Rowe?
>
> MR. ZARIAN: Clearly asked and answered because the question incorporates the previous answer, also vague.
>
> THE WITNESS: Rob Kinsella was also aware of that.
>
> Q. BY MR. BELL: And who told him that?
>
> A. I don't recall if it was Russ or myself at this time.[47]

Although Defendants contend that Ms. Floyd, in answering "I don't recall if it was Russ or myself at this time," was referring to her communication with Mr. Rick Hansen, it is not entirely clear from the testimony whether Ms. Floyd was referring to her communication with Mr. Hansen or whether she was answering the question of who informed Mr. Kinsella. This

---

[44] *Id.* at 12-13 (emphasis in the Motion) (citing 30(b)(6) Testimony of Jami Floyd at 28–31, docket no. 218-6, filed October 26, 2015).

[45] *Id.* at 14.

[46] *Id.* at 15.

[47] 30(b)(6) Deposition of Jami Floyd, docket no. 218-6, filed October 26, 2015.

testimony, viewed in favor of Mr. Rowe and viewed cumulatively with Mr. Kinsella's email communications with DPI and the testimony of Mr. Day and Ms. Hansen (discussed below) provides a reasonable basis for the jury to infer that Ms. Floyd was answering the question of who informed Mr. Kinsella.

Mr. Kinsella's email communications reveal that "[o]n September 26, Ms. Floyd wrote to Mr. Kinsella seeking a meeting between him, herself, and Russ Blake to discuss Mr. Rowe."[48] "Mr. Kinsella wrote back stating that he hoped to speak with the two of them soon."[49] "On September 28, Mr. Rowe and Ms. Floyd sent the final emails relating to the controversy over whether certain deli items should be discontinued at Smith's. Once Shellie Hanson got involved, Mr. Blake sent a private email to Ms. Floyd, asking '[d]o we need to talk about Smith's?'"[50] "About an hour later, Mr. Kinsella wrote to Mr. Blake and Ms. Floyd, announcing Mr. Rowe's removal."[51] Mr. Kinsella wrote:

I just wanted to let you know that Mark Miale and myself just had a conversation with Tom Rowe regarding his involvement with DPI at Smith's. Starting immediately Tom will have no involvement with DPI at Smith's. This has been made very clear to Tom and I am very certain he will respect our decision. . . .[52] Mr. Blake replied to Mr. Kinsella's email with a simple "Thank you."[53] These email communications provide a reasonable basis for a jury to infer that

[48] Plaintiff Thomas Rowe's Memorandum in Opposition to Defendants' Rule 50(b) Motion for Entry of Judgment as a Matter of Law at 6 ("Opposition") (Sep. 26, 2012 Floyd Email, Trial Ex. 34, docket no. 242-12, filed December 17, 2015).

[49] *Id.*

[50] *Id.* (Sep. 28, 2012 Blake Email, Ex. 130 at 1).

[51] *Id.* (Sep. 28, 2012 Kinsella Email, Trial Ex. 36, docket no. 242-14, filed December 17, 2015).

[52] Kinsella Email, Trial Ex. 36.

[53] *Id.*

Ms. Floyd or Mr. Blake spoke with Mr. Kinsella regarding Mr. Rowe's involvement with Smiths, and there it was stated that Smith's no longer wanted Mr. Rowe to work for it.

Furthermore, although there was testimony from Mr. Kinsella that it was Smith's and not DPI that requested Mr. Rowe to be taken off of the Smith's account, Mr. Rowe points out that there was no testimony from a Smith's employee affirming Mr. Kinsella's position. [54] Mr. Rowe points to testimony from two employees from Smith's denying that they requested Mr. Rowe's removal, and also stating that they were not aware of anyone at Smith's making such a request. Mr. Day (Vice President of Sales Marchandising) testified to the following:

> Q. Did you ever have a conversation with . . . [Mr. Kinsella] in the weeks or days leading up to the removal of Mr. Rowe?
>
> A. Not that I recall.
>
> Q. Did you ever request of anyone at Premier that Mr. Rowe be removed from the Smith's account?
>
> A. No.
>
> Q. To your knowledge, did anyone at Smith's request of Premier that Mr. Rowe be removed from the account?
>
> A. No.[55]

Ms. Hanson (Smith's Service Deli Merchandiser) testified:

> Q. Okay. Now, did you ever ask anyone at Premier that Rick Hansen take over for Mr. Rowe before Mr. Rowe was removed from the Smith's account.
>
> A. No.
>
> Q. Did you ever ask anyone at DPI or tell anyone at DPI that you would rather – that you wanted Mr. Rowe removed in favor of Mr. Hansen?
>
> A. No.[56]

---

[54] Opposition at 10.

[55] Day Tr. at 358:22–359:5, docket no. 242-45, filed December 17, 2015.

[56] Hanson Tr. at 25:16–23, docket no. 242-47, filed December 17, 2015.

Mr. Day's and Ms. Hanson's testimony denying that they, or to their knowledge anyone else from Smith's, made such a request provide a reasonable basis for a jury to weigh the credibility of the testimony and conclude that the statement came from Defendants. In light of this, there was sufficient circumstantial evidence from which a jury could have drawn a reasonable inference that Defendants told Mr. Kinsella that Smith's no longer wanted to work with Mr. Rowe.

### 3. "Others in the Industry" Statement

According to Defendants, it appears that Mr. Rowe "abandoned pursuing this statement at trial."[57] Defendants state that during discovery, they asked Mr. Rowe to identify to whom the alleged statement was made.[58] In response, Mr. Rowe identified Christina Johnson as the individual.[59] "However, Mr. Rowe never called Ms. Johnson as a witness at trial. Moreover, the so-called 'industry witnesses' that testified on Mr. Rowe's behalf at trial did not have any knowledge of Defendants having made the alleged Others in the Industry Statement."[60] For example, Angela Hayes, a former colleague of Mr. Rowe, testified as to Mr. Rowe's reputation in the industry, but during cross-examination, she "could not provide testimony to substantiate any of Mr. Rowe's alleged statements . . . ."[61] "Similarly, Dick Wright, another longtime industry acquaintance of Mr. Rowe, could not provide any testimony establishing that Defendants made the Others in the Industry Statement."[62] Mr. Rowe also relied on

---

[57] 50(b) Motion at 15.

[58] *Id.*

[59] *Id.* at 16.

[60] *Id.*

[61] *Id.*

[62] *Id.*

Ms. Methner's designated deposition testimony, which Defendants say likewise provides no support.[63] That testimony was as follows:

Q. Did Tom Rowe ever ask you not to order competitors' product?

A. Absolutely not.

Q. Did you ever see Tom Rowe work on competitive products?

A. Sure.

Q. More than once?

A. Yes.

. . . .

Q. Did Mr. Hanson tell you how he had come to understand this, i.e., how he came by to believe that Smith's didn't want him in the account?

A. No.

Q. Did he tell you how he had come to learn that Mr. Rowe was not working competitive product?

A. I mean, no, not that I'm aware of that he made any statements.

Q. Made any what?

A. I don't recall that he made any statement as to how he came to this understanding. I know

Q. Did he -- go ahead.

A. I know he had conversation in which I reiterated that I could only speak to my divisions, and it didn't happen here in Vegas.

Q. Okay. Did he mention to you at all the idea that -- or the allegation that Mr. Rowe had misappropriated funds?

A. Honestly, I can't recall if he actually made that statement or not.[64]

---

[63] *Id.* at 16–17.

[64] *Id.* at 17–18.

According to Defendants, "[a]t no point in this testimony did Ms. Methner provide testimony to support Mr. Rowe's allegation that 'Defendants told others in the industry that Smith's refused to deal with Mr. Rowe because he refused to work on competitive products.'"[65]

Mr. Rowe, in opposition, states that Defendants overlook a part of Ms. Methner's testimony which "unequivocally defeats Defendants' unsupported argument that there is no evidence to support the claim that they accused Mr. Rowe of refusing to work on competitive products."[66] That testimony was:

> Q. Okay. And were you able to note that behavior directed at others besides yourself by Jami Floyd?
>
> A. I know that she made comments to me that she was just doing what her customers ask, and that she made a comment to me that – and I can't quote it because it's been a long while – that **something about that Tom refused to work with other people's products**, which all I can tell you is—what I said to her was "Not here in Vegas. That has never happened. You can ask around. Not one time have we ever been instructed not to work other people's products."[67]

Defendants contend that this single hearsay statement by Ms. Methner "does not establish that Ms. Floyd made the alleged statement to others in the industry. Ms. Methner was one of Mr. Rowe's subordinates at Premier."[68] Defendants point out that in Mr. Rowe's Complaint, "Mr. Rowe clearly alleged that the Defendants defamed him by 'tell[ing] others within the industry that Smith's terminated Mr. Rowe because he refused to work on competitive products.'"[69] "By its plain terms, Mr. Rowe's allegations assert that the Defendants defamed him by talking to potential employers and other (i.e. non-Premier) industry players."[70] Mr. Rowe's

---

[65] *Id.* at 18.

[66] Opposition at 12.

[67] *Id.* (quoting Methner Dep. Designation at 1, Dep. Page 30:1-30:24, docket no. 42, filed December 17, 2015 (emphasis added)).

[68] Reply at 14.

[69] *Id.* (Complaint, docket no. 2-1, at ¶ 40).

[70] *Id.* at 14–15.

cited evidence, even when considered in the light most favorable to him, is insufficient for a reasonable jury to find that Defendants told others in the industry that Smith's refused to deal with Mr. Rowe because he refused to work on competitive products.

Although there was insufficient evidence for the third defamatory statement, there was sufficient evidence from which a jury could have drawn a reasonable inference that one of the other two defamatory statements were made.

## B. Sufficient Evidence was Submitted From Which a Jury Could Reasonably Infer that Defendants Acted with the Requisite Degree of Fault

Mr. Rowe's defamation claim required him to present sufficient evidence that Defendants acted with a requisite degree of fault. Specifically, Mr. Rowe was required to present evidence that Defendants made the defamatory statements (1) knowing that the statements were false; (2) in reckless disregard of whether the statements were true or false; or (3) with malice; that is, out of a desire to do harm, or with spite, ill will, hatred, or an improper motive.[71] Defendants contend that Mr. Rowe failed to present evidence that Defendants acted with the requisite degree of fault.[72] However, Defendants' arguments in support of this issue are insufficiently developed and lack merit. Defendants first state that "[t]he same arguments discussed in Part I above regarding the lack of evidence of the alleged statements also apply to Mr. Rowe's lack of evidence of his Requisite Degree of Fault."[73] Defendants then provide two supporting arguments. First, they state that Mr. Rowe failed to present evidence that Defendants acted with malice in raising questions concerning Mr. Rowe's behavior at the 2012 charity golf tournament.

---

[71] Jury Instructions, docket no. 207, filed September 1, 2015. *See* Memorandum Decision and Order Denying Defendants' Motion for Summary Judgment at 5–9 (finding that a qualified privilege applied to the defamatory statements, and therefore, the burden shifts to Mr. Rowe to prove abuse of the privilege through a higher standard of fault).

[72] 50(b) Motion at 18.

[73] *Id.* at 19.

Ms. Floyd was aware of Mr. Rowe's numerous behavior issues and given her knowledge of Mr. Rowe's history, "she was concerned when she observed Mr. Rowe drinking and not sharing raffle tickets at the golf tournament with Ms. Shellie Hanson, an important customer representative."[74] Second, Defendants argue that the requisite degree of fault is also lacking with respect to the other statements at issue.[75] They support this contention with an example. They state:

> Mr. Kinsella testified that *Smith's* (not DPI) told him that they no longer wanted Mr. Rowe to call on the Smith's account. Thus, even if there had been evidence at trial to support a finding that Defendants made the Smith's No Longer Wants Rowe Statement, Mr. Kinsella's testimony establishes that the statement (if made) was *true*. Other than Defendants, Mr. Kinsella is the only witness who could testify about what Defendants allegedly told him regarding Smith's intentions. Given that Mr. Rowe admitted he never heard Defendants make the statements at issue, the only evidence at trial regarding the Smith's No Longer Wants Rowe Statement was that (1) it was not made by Defendants and that, even if made, (2) it was true.[76]

Defendants' above example fails. As discussed in section A.2 above, evidence was presented casting doubt on the veracity of Mr. Kinsella's testimony regarding who informed him that Smith's no longer wanted Mr. Rowe.

Mr. Rowe presented sufficient evidence from which a jury could reasonably infer that Defendants made the defamatory statements with knowledge of their falsity or with reckless disregard for the truth.[77] The Utah Supreme Court defined reckless disregard in *Ferguseon v. Williams & Hunt, Inc."*[78]

---

[74] *Id.*

[75] *Id.*

[76] *Id.* at 19–20.

[77] It is unnecessary to reach the question of malice, as evidence of knowledge or reckless disregard is sufficient to show that that the qualified privilege was abused.

[78] 221 P.3d 205 (Utah 2009).

A publisher's knowledge of the falsity of a statement is inherently subjective. To prove knowledge of falsity, a plaintiff must present evidence that shows the defendant knows the defamatory statement is untrue. Likewise, acting with reckless disregard as to the statement's falsity involves a showing of subjective intent or state of mind. The Restatement explains that reckless disregard as to falsity "exists when there is a high degree of awareness of probable falsity or serious doubt as to the truth of the statement."[79] But while reckless disregard is substantially subjective, certain facts may show, regardless of the publisher's bald assertions of belief, that "the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation" or that "there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."[80] Therefore, reckless disregard as to the falsity of statement that a defendant honestly believed to be true is determined by a subjective inquiry as to the defendant's belief and an objective inquiry as the inherent improbability of or obvious doubt created by the facts.[81]

There was no basis for the jury to consider Defendants' *subjective* intent or state of mind as to the falsity of the statement because Defendants argued that such a statement was never made. However, Defendants' own "inherently improbable" argument in section A.1. above provides a basis from which the jury could have reasonably inferred knowledge of the falsity of the statement on an objective inquiry. Defendants state that "the evidence at trial showed that Mr. Rowe's allegation concerning the Misappropriated Money statement was nonsensical."[82] Defendants point out that the evidence at trial established that Mr. Rowe did not personally handle any money in connection with the golf tournament.[83] "The evidence at trial also established that DPI was an integral part of the administrative processing of donations that negated the need for Mr. Rowe to personally handle any money."[84] Therefore, they say,

---

[79] Restatement (Second) of Torts § 600 cmt. b (1977); *see also* <u>*St. Amant v. Thompson,* 390 U.S. 727, 731 (1968)</u> ("There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.").

[80] *St. Amant,* 390 U.S. at 732.

[81] *Ferguseon*, 221 P.3d at 215.

[82] 50(b) Motion at 7.

[83] *Id.*

[84] *Id.* at 8.

"Defendants had no reason to make such a statement, given that *they knew* he did not handle money, and Mr. Kinsella would never have understood such a statement as defamatory."[85] The argument that the statement was "nonsensical" and inherently improbable because Ms. Floyd knew that Mr. Rowe never handled any money in connection with the golf tournament allows a reasonable jury to infer Defendants *made* the statement *knowing* it to be false, or at the very least, with reckless disregard for the truth.

Similarly, Defendants' position was that they never made the "Smith's no longer wanted Mr. Rowe to work for it" statement. Thus there was no basis for the jury to consider Defendants' *subjective* intent or state of mind as to the falsity of the statement. However, evidence was presented from which a reasonable jury could infer that the statement was inherently improbable and that Defendants made the statement knowing it to be false, or at the very least, with reckless disregard for the truth. The evidence was the testimony of the two Smith's witnesses—Mr. Day and Ms. Hanson—testifying that they never made such a request and to their knowledge no one at Smith's made the request for Mr. Rowe's removal. Furthermore, the only evidence to the contrary was Defendants' and Mr. Kinsella's testimony, which presented questions of credibility for the jury.

### C. There was Sufficient Evidence from Which a Jury Could Reasonably Infer that the Defamatory Statements were the Actual and Proximate Cause of Mr. Rowe's Damages

Defendants argue that at trial there was a total lack of evidence that they caused Mr. Rowe's termination.[86] Defendants provide three arguments in support.

- First, "[t]here was no evidence that Defendants exercised control over Premier's employment decisions."[87] "Rather, the undisputed evidence at trial was that

---

[85] *Id.* at 7–8 (emphasis added).

[86] Motion at 20.

[87] *Id.* at 21.

Premier's owner, Mr. Kinsella, made the decision to terminate Mr. Rowe four months after he removed Mr. Rowe from the Smith's account."[88] "Mr. Kinsella testified that he made the decision to remove Mr. Rowe based on a request *from* Smith's, not from DPI. Moreover, Mr. Kinsella testified that *he* made the decision to terminate Mr. Rowe based on his determination of what was in *Premier's* best interest."[89]

- Second, "it is undisputed that Premier terminated Mr. Rowe for 'behavioral reasons,' as stated in the January 23, 2013, termination letter from Premier's counsel."[90] "[T]here was ample evidence of Mr. Rowe's 'behavior issues' presented at trial, including admissions by Mr. Rowe that he engaged in inappropriate conduct with coworkers."[91]

- Finally, "it is also undisputed that, after Mr. Rowe was removed from the Smith's account, Mr. Kinsella and Mr. Rowe engaged in communication regarding alternative positions for Mr. Rowe within the company."[92]

Mr. Rowe contends that he was not terminated for behavioral reasons. Mr. Rowe points out that "Mr. Kinsella never once affirmed that he terminated Mr. Rowe because of behavioral issues . . . . [and to] the contrary, he testified that Mr. Rowe was terminated because 'there was really little for him to do at that point. He couldn't call on the customer and there wasn't really anything for him to do.'"[93]

Mr. Rowe does not dispute that after his removal from the Smith's account, he had discussions with Mr. Kinsella regarding potential job opportunities, but he argues that they merely added up to illusory promises.[94] Mr. Rowe cites to record evidence which he claims shows that "he made major efforts to engage Mr. Kinsella, seeking many opportunities to speak

---

[88] *Id.*

[89] *Id.*

[90] *Id.*

[91] *Id.*at 22.

[92] *Id.*

[93] Opposition at 25 (quoting Kinsella Dep. Designation at 12, Dep. Pages 185:25-186:10, docket no. 242-41, filed December 17, 2015).

[94] *Id.* at 27.

with him about possible other opportunities."[95] "Ultimately, Mr. Kinsella failed to respond to any real effort by Mr. Rowe to take any new position, including his attempt to accept a position in Memphis."[96] Mr. Rowe concludes that his "termination followed as a natural and proximate result of the removal from the Smith's account. The clear responsibility Defendants bear for the removal is just as heavy with regard to the termination, since the former directly caused the latter."[97]

Drawing all reasonable inferences in favor of Mr. Rowe, there was legally sufficient evidentiary basis for a reasonably jury to weigh the credibility of the witnesses and evidence and conclude that Defendants' defamatory statements were the actual and proximate cause of Mr. Rowe's employment termination from Premier.[98]

## CONCLUSION

The record contains evidence sufficient to support the jury's verdict in favor of Mr. Rowe. Therefore, IT IS HEREBY ORDERED that Defendants' Motion for Judgment as a Matter of Law[99] is DENIED.

Dated August 6, 2016.

BY THE COURT:

David Nuffer
United States District Judge

---

[95] *Id.* (citing Tr. Ex. 75 at 1, docket no. 242-23; Tr. Ex. 113 at 1, docket no. 242,-27; Tr. Ex. 115 at 1–2, docket no. 242-28; Tr. Ex. 118 at 1, docket no. 242-29; Tr. Ex. 119, docket no. 242-30; Tr. Ex. 120, docket no. 242-31; Rowe Tr. at 162:3-167-6, docket no. 242-48, filed December 17, 2015).

[96] *Id.* (citing Rowe Tr. At 181:22–182:2).

[97] *Id.* at 28.

[98] Defendants' arguments on causation are the same ones previously raised in their summary judgment motion. *See* Defendants' Motion for Summary Judgment ("Motion"), docket no. 38, filed November 5, 2014. Therefore, their 50(b) motion on this issue can also be rejected for the same reasons discussed in the Memorandum Decision and Order Denying Defendants' Motion for Summary Judgment.

[99] Docket no. 218.